UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,        Case Number 18-20633
v.        Honorable David M. Lawson

DELMAL LAMAR MYERS,

        Defendant.
_____/

## OPINION AND ORDER DENYING MOTIONS TO SUPPRESS EVIDENCE

Defendant Delmal Myers, charged with being a felon in possession of a firearm, has filed motions to suppress two categories of evidence: firearms recovered from his residence during a search by police conducted with a warrant; and statements he made to state and federal police following his arrest and before he was brought before a federal magistrate. He contends that the search warrant was not supported by probable cause, and the delay in presenting him to a judicial officer violates Federal Rule of Criminal Procedure 5(a) and the *McNabb-Mallory* rule. Although the search warrant affidavit failed to establish probable cause to search the defendant's residence, the officer's good faith reliance on the warrant precludes the application of the exclusionary rule. The delay in bringing the defendant before a judicial officer was not unreasonable, when measured from the time the defendant was taken into federal custody. Therefore, the Court will deny both motions.

I. Facts

City of Roseville police officers obtained a warrant to search two single-family residences on Moross Road in Detroit, Michigan in September 2018. Both are associated with Myers. The record does not indicate how far one residence was from the other — although map data puts them

about two miles apart (about a five-minute drive) — and the parties mostly have redacted the addresses from the documents.  The affidavits supporting the warrant requests identify one of the homes — labeled in this record as the "1st Premises" — as the defendant's "trap house" (a house where illegal drugs "are stored, sold, bought, used and even produced at times").  The "2nd Premises" appears to be where Myers lived.  Myers does not contest the search warrant for the 1st Premises.  He argues, however, that the warrant to search the 2nd Premises is invalid because the affidavit does not establish probable cause to believe that evidence of a crime would be located there.  He says that the affidavit contains no facts establishing a nexus between the evidence sought and the 2nd Premises.

A.  Investigation, Search Warrant Issuance, and Arrest

Roseville Police Detective Sergeant Jason Otto applied to a state magistrate for the search warrants on September 5, 2018.  He suspected that Myers was involved in drug trafficking.  The next day at 6:55 a.m., Roseville police officers and Drug Enforcement Administration (DEA) agents executed the warrants.  At the 2nd Premises, they discovered two handguns.  At approximately 8:45 a.m., Roseville police officers obtained a third warrant from the same state magistrate to search the 2nd Premises again.  The scope of that warrant was expanded to cover contraband and substances in violation of the Michigan Public Health Code, including heroin.  The follow-up search conducted at the 2nd Premises recovered no additional evidence.

According to the government, while the first search was underway and after being advised of and waiving his *Miranda* rights, Myers made admissions to Roseville police officer Burley that he resided at the 2nd premises and that the firearms were his.  Myers was taken to the St. Clair Shores Police Department on an outstanding warrant for failing to appear in traffic court.  He posted a $600 bond shortly before noon, but at the request of the Bureau of Alcohol, Tobacco,

Firearms and Explosives (ATF), Myers was taken into custody at the Roseville police department, where he and the firearms were held overnight. The next day at approximately 11:00 a.m., ATF agents transported Myers to the federal courthouse in Detroit, where a criminal complaint had been issued that morning alleging a single charge of felon in possession of a firearm. A federal magistrate judge had issued an arrest warrant earlier that morning.

While en route to his initial appearance hearing and after being advised of and waiving his *Miranda* rights for a second time, Myers made recorded admissions to the ATF agents that he possessed the firearms recovered from the search at the 2nd Premises. According to the docket sheet, Myers was presented to the magistrate judge no later than 4:15 p.m. on September 7.

B. Affidavit for Warrant to Search 2nd Premises

In his affidavit, Detective Otto averred that he had been employed by the Roseville Police Department for fourteen years. At the time, he was assigned to a special investigations unit that investigated drug trafficking. He attended a police academy, had received 32 hours of training in narcotics investigation, and participated in about two weeks of training put on by the DEA. He participated in "many" narcotics investigations that resulted in "multiple" arrests.

Otto wrote that in August 2018, Roseville city police officers began investigating a drug-trafficking lead. Roseville's Special Investigation Unit received a tip from a confidential informant ("CI 1050") that a tall black male with a dark complexion using the street name "Owei" was selling marijuana and heroin in Macomb and Wayne Counties. CI 1050 provided Owei's phone number to Otto, who identified it as belonging to defendant Delmal Lamar Myers. After viewing a photograph of Myers that the police obtained from the Michigan Digital Image Retrieval System, CI 1050 confirmed that "Owei" in fact was Myers.

CI 1050 had "intimate" knowledge of Myers's drug operation, which Otto said he corroborated. Otto deemed CI 1050 a reliable source. The informant reported that Myers previously had fronted him illegal narcotics that he sold from the 1st Premises, which Otto characterized as a trap house. The informant was indebted to Myers for these fronted drugs.

The police instructed CI 1050 to set up a series of meetings with Myers to pay down his debt using recorded funds provided to him. Otto was with CI 1050 on one occasion during the first week of August 2018 when a call was placed to Myers to set up one of the meetings. After Myers agreed to meet CI 1050, Roseville police detective Saier observed him leave the 1st Premises driving a gray, 2004 Infinity FX35 ("Infinity"). Once he collected the funds, Myers was seen driving in an erratic manner, speeding, and making prohibited or multiple unnecessary turns — a detection avoidance tactic known to law enforcement personnel as "cleaning."

The following week the surveillance team observed heavy traffic at the 1st Premises when Myers was present, an occurrence Otto averred is typical at a trap house. Individuals would arrive in vehicles, step into the house for a couple minutes, and then drive away. Sometimes Myers walked out to the vehicles as they arrived and performed a hand-to-hand exchange through the window. These interactions were brief, lasting only a couple minutes. Myers also was observed driving the Infinity, as well as a silver, 2006 Mercedes Benz R-Class ("Mercedes"), to and from that location. Roseville police ran a search of the license plates and found that both were registered to Jwan Shnita Ellison, who also lives on Moross Road.

That same week, CI 1050 arranged another meeting with Myers to pay down his debt. This time Myers informed CI 1050 that he would bring a sample of some new product for CI 1050. A short time after the call was placed, Myers arrived at the designated location driving the Mercedes. Myers collected the recorded funds and gave CI 1050 a quantity of suspected heroin,

which later was field-tested and found to be heroin with fentanyl compound or methamphetamine. Roseville police detectives monitored Myers as he returned to the 1st Premises.

The next meeting took place during the week of August 19. This time Myers was observed leaving the 1st Premises in the Mercedes. He returned to the 1st Premises after collecting the money from CI 1050, once again cleaning as he drove. Roseville police detective Trombley observed that Myers let himself in the house's side door.

That same week, Otto and Roseville detective Burley, while surveilling the trap house, saw Myers leave the residence and lock the door. He then drove the Infinity to the 2nd Premises, where the Mercedes was parked in the driveway. Myers entered the residence through a side door. Nothing in the record indicates how long Myers remained there or where he went afterward.

Otto was with CI 1050 on August 20 when he called Myers to arrange another meeting to pay down his drug debt. After the call, detectives Burley and Saier saw Myers leave the 1st Premises in the Infinity. Ten minutes later, Myers arrived at the meeting location. The informant gave Myers recorded funds, and then Myers returned to the 1st Premises, again using cleaning maneuvers.

During that same week, a surveillance team observed Myers arrive at the 2nd Premises in the Mercedes, stay a short time, and drive the Mercedes to the 1st Premises.

Within the 48 hours preceding the search, Otto observed Myers leaving and returning to the 2nd Premises. Also within that time frame, the police arranged a controlled buy with CI 1050. Detective Burley observed Myers depart the 1st premises, and ten minutes later Myers met with the informant and delivered heroin.

Otto also averred that he knew that drug dealers sometimes use multiple locations to store their stock, records, drug proceeds, and weapons, so that if one location is raided, all will not be lost. He believed that the 2nd Premises was one of Myers's locations and that evidence of drug trafficking would be found there. Other than Myers's comings and goings, however, he did not cite any facts that led him to that belief.

Based on this affidavit, the state magistrate issued a warrant to search the 2nd Premises and seize items typically found in a drug trafficking operation and suspected of being connected to it: records, ledgers, currency, photographs, computers, weapons, cell phones, and other electronic devices. But the warrant did not authorize the police to search for "all substances suspected of being in violation of the Michigan Public Health Code, specifically but not limited to Heroin," and contraband suspected of being connected to illegal trafficking of controlled substances, as Otto had requested. The magistrate also issued another warrant at the same time to search the 1st Premises, based on a very similar affidavit. That warrant authorized the seizure of drugs and other narcotics-related contraband.

The police executed the search warrant on the 2nd Premises on the morning of September 6, 2018. No evidence of recent drug trafficking was found. But the search yielded two handguns, a scale, and a small piece of drug packaging, which field tested positive for heroin. Based on that discovery, the police returned to the magistrate and obtained a warrant to search the 2nd Premises for heroin and other illegal drugs. None were found.

## II. Motion to Suppress Firearms
### A. Invalidity of the Search Warrant

Myers insists that the facts in detective Otto's affidavit did not establish probable cause to search the 2nd Premises, so the warrant was invalid, and the search was unreasonable.

The basic legal principles are well established. "The Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *Liberty Coins, LLC v. Goodman*, 880 F.3d 274, 280 (6th Cir. 2018) (quoting U.S. Const. amend. IV). Although the amendment was intended to guard against a variety of governmental intrusions, "the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *Payton v. New York*, 445 U.S. 573, 585-86 (1980) (quoting *United States v. United States District Court*, 407 U.S. 297, 313 (1972)).

"A search is generally unreasonable if it is not conducted pursuant to a warrant issued upon probable cause." *Liberty Coins*, 880 F.3d at 280 (citing *Camara v. Municipal Court of City & County of San Francisco*, 387 U.S. 523, 528-29 (1967)). "Probable cause exists if 'the facts and circumstances are such that a reasonably prudent person would be warranted in believing that an offense had been committed and that evidence thereof would be found on the premises to be searched.'" *Peffer v. Stephens*, 880 F.3d 256, 263 (6th Cir. 2018) (quoting *Greene v. Reeves*, 80 F.3d 1101, 1106 (6th Cir. 1996)).

Before a magistrate may authorize a search warrant, he must conclude that "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The search warrant applicant must "support an application for a search warrant with a substantial basis linking the evidence to be seized and the place to be searched." *United States v. McCoy*, 905 F.3d 409, 415 (6th Cir. 2018) (citing *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc)).

The affidavit detective Otto signed contained ample information to support the conclusion that Myers was engaged in drug trafficking, and that he was using the 1st Premises as the center of his operation. Myers fronted drugs to the informant, who met with him on multiple occasions

to pay down his drug debt. Myers sold drugs to the informant during controlled buys. And he even offered him a sample of "new product." Each time a delivery was made, Myers began and ended the trip at the 1st Premises. And it was there that he was seen conducting a robust retail business.

None of that evidence, however, was applicable to the 2nd Premises. The only information disclosed by the affidavit was that Myers came and went from there, and that the same vehicles he used to drive to his meetings with the informant were also parked there on occasion. Rather than appearing as a center of operations, the 2nd Premises looked like nothing more than Myers's residence. "[T]he allegation that the defendant is a drug dealer, without more, is insufficient to tie the alleged criminal activity to the defendant's residence." *United States v. Frazier*, 423 F.3d 526, 533 (6th Cir. 2005). "[U]nlike guns and computers that are used in the commission of a crime, when drugs are used in the commission of a distribution offense, the distributed drugs are no longer in the possession of the suspected distributor. The affidavit therefore must establish some other reason to believe that drugs or other evidence of crime would be found in the suspect's residence if searched." *Peffer*, 880 F.3d at 273.

The court of appeals emphasized that point in *United States v. Brown*, 828 F.3d 375 (6th Cir. 2016), on which Myers principally relies. In that case, DEA agents obtained a warrant to search the defendant's home after he and a known drug trafficker were arrested for attempted delivery of heroin. *Id.* at 378-79. Their arrests resulted from a DEA investigation into the trafficker's operations, including surveillance at his home and conducting controlled buys. *Ibid.* Before his arrest, Brown was seen at the trafficker's home with the trafficker shortly before they departed to deliver heroin to a DEA agent. A subsequent search of Brown's phone, pursuant to a warrant, revealed a text message concerning pricing for cocaine. *Id.* at 379-80. The agents also

searched the trafficker's home, at which time a detection dog alerted to the odor of narcotics in Brown's vehicle. *Id.* at 379. Those facts, along with Brown's history of drug convictions, furnished the purported basis to search Brown's home; there were no "additional facts pertaining to Brown's involvement in the alleged heroin conspiracy." *Id.* at 380.

In concluding that the police lacked probable cause to search Brown's residence, the Sixth Circuit found that the nexus requirement was lacking, where "the affidavit contained no evidence that [the defendant] distributed narcotics from his home, that he used it to store narcotics, or that any suspicious activity had taken place there." *Id.* at 382. Nor did it "suggest that a reliable confidential informant had purchased drugs there, that the police had ever conducted surveillance at Brown's home, or that the recorded telephone conversations linked drug trafficking to Brown's residence." *Ibid.* The court also suggested that "the evidence supposedly establishing Brown's status as a drug dealer was . . . inadequate." *Id.* at 384.

The court invalidated the search, explaining that "if the affidavit fails to include facts that directly connect the residence with the suspected drug dealing activity, . . . [then] it cannot be inferred that drugs will be found in the defendant's home — even if the defendant is a known drug dealer." *Ibid.* That is because "[t]he critical element in a reasonable search is not that the owner of property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978). The *Brown* court cited examples of the type of additional information that might suffice to establish probable cause to search the home of a known drug dealer, such as evidence that someone saw the defendant dealing drugs there. *Brown*, 828 F.3d at 383. Absent some additional fact, though, a search warrant affidavit will not support the search of a known drug dealer's home. *Ibid.* ("We have never held . . . that a suspect's 'status

as a drug dealer, standing alone, gives rise to a fair probability that drugs will be found in his home.'" (citing *United States v. Frazier*, 423 F.3d 526, 533 (6th Cir. 2005))).

The rules for assessing the sufficiency of a search warrant affidavit are well known. The Court is limited to viewing "the four corners of the affidavit." *United States v. Church*, 823 F.3d 351, 360-61 (6th Cir. 2016) (citing *United States v. Rose*, 714 F.3d 362, 366 (6th Cir. 2013)). But the Court does not scrutinize each line; instead it considers the totality of the circumstances that the affidavit presents. *United States v. Brown*, 732 F.3d 569, 573 (6th Cir. 2013). And it applies common sense and avoids picking at technicalities. *Ibid.* Under that approach, it is difficult to find facts in the affidavit that support a search of the 2nd Premises. The only mention of that dwelling is that Myers was seen entering as if he controlled the place, and that the cars he drove in his drug business were seen parked there on occasion.

Although the affidavit must be evaluated on what in contains, not what it omits, *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000), the comparison between the activity at the 1st Premises and the lack of any such activity at the 2nd premises shows what is lacking. That comparison is fair, as it is part of the total circumstances. Myers worked his drug business through the 1st Premises. He merely lived at the 2nd Premises. The only facts mentioned are that he drove there — without engaging in the cleaning maneuvers that characterized his arrivals at and departures from the 1st Premises — and his vehicles were seen parked on the driveway. He apparently did not spend much time at the 1st Premises, except when his retail business was up and running. There are no comparable facts about the 2nd Premises, where it appears that the defendant stayed for extended periods. Detective Otto said that he thought he would find evidence of drug trafficking at the 2nd Premises, but that was based on his speculation that some drug dealers use multiple locations. He was not able to point to any fact that the 2nd Premises was one of them.

The state magistrate apparently had some doubts about that conclusion as well. In the first search warrant for the 2nd Premises, he did not authorize the police to search for drugs or other contraband. Curiously, he did authorize a search for "[a]ll weapons used to protect controlled substances," which seems to put the cart before the horse. If he could not find probable cause that drugs would be found on the premises, why would there be a likelihood that drug-protecting weapons would be there?

The inference sometimes cited in the appellate cases that drug dealers keep their stock and records where they live is derived from the idea that in an ongoing business, drug dealers must put those things somewhere. *See Brown*, 828 F.3d at 383 & n.2. But in this case, the affidavit contained facts that undercut, rather than supported, that inference. The 1st Premises, also a residence, was the proper subject of that inference. But without some "evidence that [the defendant] distributed narcotics from his home, that he used it to store narcotics, or that any suspicious activity had taken place there," *id.* at 382, the 2nd Premises became just another house on the block.

Because the affidavit did not contain facts from which one could find probable cause to believe that contraband or evidence of crime would be found at the 2nd premises, the state magistrate erred in authorizing the police to search it.

## B. Good Faith

The usual remedy for an unconstitutional search and seizure is exclusion of the evidence at the defendant's trial, if the defendant is the victim of the unlawful search. *Illinois v. Krull*, 480 U.S. 340, 347 (1987). Courts have considered and weighed the costs wrought by the exclusionary rule, *ibid.* (citing *United States v. Janis*, 428 U.S. 433, 454 (1976), and *United States v. Calandara*, 414 U.S. 338, 351-52 (1974)), and concluded that it serves a useful deterrent role in enforcing

Fourth Amendment rights, *ibid.* But the Supreme Court has determined that the exclusionary rule's deterrent effect should focus on the police, not on magistrates who may make mistakes in assessing probable cause. *United States v. Leon*, 468 U.S. 897, 916 (1984) (positing that "the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates"). Therefore, because the 2nd Premises was searched under the authority of a search warrant issued by a state judicial officer, the Court must determine if the Roseville police officer's good faith reliance on the warrant amounts to an exception to the exclusionary rule. *United States v. White*, 874 F3d 490, 496 (6th Cir. 2017).

"Following *Leon*, courts presented with a motion to suppress claiming a lack of probable cause must ask 'whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's decision.'" *Ibid.* (quoting *United States v Hodson*, 543 F.3d 286, 293 (6th Cir. 2008)). "Only when the answer is 'yes' is suppression appropriate." *Ibid.*

The Supreme Court identified four instances where this good faith exception to the exclusionary rule will not apply; each implicates officer misconduct, where deterrence might be effective, or official defalcation by the judicial officer. The first is where the affiant misleads the magistrate by false or reckless information. The second is when the magistrate sides with the police, abandons neutrality, and becomes a rubber stamp. Third, when the affidavit is so deficient that no reasonable officer could believe that probable cause could be found, there is no exemption from the exclusionary rule. And fourth, there can be no good faith reliance on a search warrant that is so lacking in particularity that a reasonable officer could not believe it is valid. *Leon*, 468 U.S. at 923 (citations omitted).

Myers directs his arguments at the second and third scenarios. The discussion of the second scenario is not clearly articulated, but it appears that Myers accuses the state magistrate of

authorizing a sham initial search of the 2nd Premises knowing that it likely would lead to the discovery of drugs and contraband in plain view, which would provide probable cause for a subsequent search. There is no evidence in the record that supports such an inference. Myers apparently believes that the sequence in which evidence was recovered is by itself enough to conclude that the issuing judge played an active role in the investigation. For his claim to succeed, however, Myers must show that the state magistrate was in some way "entangled in law enforcement activities." *United States v. Czuprynski*, 46 F.3d 560, 564 (6th Cir. 1995). The bar for such a finding is high. *See United States v. Warren*, 365 F. App'x 635, 637 (6th Cir. 2010) (concluding that the issuing magistrate did not abandon his "neutral judicial role" even where he "acted unconventionally" by correcting inaccuracies and ambiguities in the affidavit himself). In *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319 (1979), the case giving rise to the second scenario outlined in *Leon*, the issuing judicial officer "allowed himself to become a member, if not the leader, of the search," acting as an "adjunct law enforcement officer" and ordering police officers to seize items. *Id.* at 327. The facts of this case are in no way comparable. Instead, it appears that the state magistrate imposed a limitation on the police, who requested authorization to search for drugs in the first application to search the 2nd Premises. That suggests neutrality and detachment, not collusion.

In assessing the third scenario, *United States v. McCoy* provides considerable guidance. There, the court explained that "[f]or an officer's reliance on a warrant to have been reasonable, the application must have provided 'a minimally sufficient nexus between the illegal activity and the place to be searched.'" *McCoy*, 905 F.3d 416 (quoting *Brown*, 828 F.3d at 385); *see also United States v. Frazier*, 423 F.3d 526, 536 (6th Cir. 2005) (explaining that good-faith reliance on

an affidavit requires a "less demanding showing than the 'substantial basis' threshold required to prove the existence of probable cause" (quoting *Carpenter*, 360 F.3d at 595)).

The focus in *McCoy* was on the proposition that drugs might be found in the home of a known drug dealer, which by itself would not establish probable cause. But that may be sufficient to support an officer's good faith reliance on a search warrant. *McCoy*, 905 F.3d 417 ("[A] link between the drug dealer's activities and his home that would be insufficient to establish probable cause may suffice to establish good-faith reliance on the warrant.") (citing *Frazier*, 423 F.3d at 537). The "link" that supported the good faith exception in *McCoy* was the defendant's "continual-and-ongoing-operations" of a drug distribution business. *Ibid.* Those facts, the court held, "are enough to satisfy the 'less demanding' good-faith standard." *Id.* at 419.

As discussed above, the search warrant affidavit in this case shows that Myers was involved in a continuous and ongoing drug trafficking business. That reasonable inference justified the probable cause finding for the search of the 1st Premises, which Myers does not challenge. And following *McCoy*, that is enough to find that the officers would not have known that the search warrant was illegal despite the magistrate's decision. After all, the warrant authorized a search for records and proceeds, not the drugs themselves.

The difference between a "substantial basis" and a "minimally sufficient nexus" is fact based and not easy to articulate. And it is true that negating the exclusionary rule's deterrent effect by allowing the police a near-miss safety valve dilutes the Fourth Amendment's protections. But faithful application of Sixth Circuit precedent ordains the result in this case. The good faith exception to the exclusionary rule saves the evidence recovered in the search of the 2nd Premises. Likewise, the two statements Myers made at the 2nd Premises while under arrest, and after he was given *Miranda* warnings, will not be suppressed.

III. Delay in Presentment

As noted above, during the search of the 2nd Premises, Myers was arrested on an outstanding traffic warrant and taken to court at St. Clair Shores, Michigan. He posted bond, but the Roseville police took him back to their police station because ATF agents asked that he be detained. He was taken to the federal courthouse in Detroit the next day and presented to a federal magistrate judge more than 23 hours later. Myers argues in a second motion that a recorded statement he made to federal authorities during that period of delay must be suppressed under the *McNabb-Mallory* rule.

The foundation of Myers's argument is Federal Rule of Criminal Procedure 5(a), which states that "[a] person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge." Fed. R. Crim. P. 5(a)(1). In *McNabb v. United States*, 318 U.S. 332 (1943), the Supreme Court held that confessions are inadmissible when they are obtained during a period of unreasonable delay between arrest and presentment to a judicial officer. The next year, Rule 5(a) was adopted to require prompt presentment. The Court addressed the exclusionary rule remedy for a violation of Rule 5(a) in *Mallory v. United States*, 354 U.S. 449 (1957), where it held that "a confession given seven hours after arrest [was] inadmissible for 'unnecessary delay' in presenting the suspect to a magistrate, where the police questioned the suspect for hours 'within the vicinity of numerous committing magistrates.'" *Corley v. United States*, 556 U.S. 303, 308 (2009) (quoting *Mallory*, 354 U.S. at 455).

Although the Supreme Court left open what constitutes unnecessary delay under the *McNabb-Mallory* rule, Congress later established a safe-harbor period, allowing admission of voluntary confessions obtained before presentment to a judicial officer, as long as the delay did not exceed six hours. *See* 18 U.S.C. § 3501(c) ("[A]confession made or given . . . while such

person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a magistrate judge . . . if such confession is found by the trial judge to have been made voluntarily and . . . if such confession was made or given by such person within six hours immediately following his arrest or other detention."). The Supreme Court has explained that in the wake of section 3501(c), where a defendant has not been presented to a judicial officer "without unnecessary delay," courts apply the *McNabb-Mallory* rule only to statements obtained after six hours have elapsed. *Corley*, 556 U.S. at 322 ("If the confession occurred before presentment and beyond six hours, . . . the court must decide whether delaying that long was unreasonable or unnecessary under the *McNabb-Mallory* cases, and if it was, the confession is to be suppressed.").

The government argues that Myers in fact was presented to a federal magistrate judge within the six-hour window, because that period is measured from the beginning of federal detention. *United States v. Davis*, 459 F.2d 167 (6th Cir. 1972), supports that contention. *Id.* at 170 ("In applying Rule 5(a), we previously have indicated that ordinarily the relevant delay is measured from the commencement of federal detention."). The parties agree that Myers was held at the Roseville police department from approximately 12:30 p.m. on September 6 until approximately 11:00 a.m. on September 7, albeit at the request of federal agents. ATF agents picked him up at that time and transported him to the federal courthouse in Detroit. He confessed en route. He appeared before a federal magistrate judge later that afternoon.

Myers argues, however, that the ATF agents were in league with the Roseville police, so federal detention began when the federal authorities imposed a "hold" on Myers's release. The government acknowledges, as it must, a "working relationship" between state and federal authorities. Myers was held by the Roseville police, after he posted bond on the state traffic

violation, solely at the request of federal authorities, who were in discussions with the state authorities about federally prosecuting him. That, certainly, was a working relationship.

However, a working relationship alone will not start the *McNabb-Mallory* clock. There also must be evidence that the arrangement between state and federal authorities was "illegitimate," that is, that it was "'for the purpose of aiding and abetting the federal officers in carrying on interrogation of the suspect in violation of Federal Rule 5(a) requiring prompt arraignment.'" *Davis*, 459 F.2d at 170 (quoting *United States v. Hindmarsh*, 389 F.2d 137, 146 (6th Cir. 1968)). There is no such evidence here. It would make little sense for federal authorities to delay presentment just so they could interrogate Myers about the firearm offense when he already had confessed to Roseville police that he owned the guns. Where there is no proof of an improper purpose, the time clock before presentment starts with federal detention. *United States v. Woods*, 613 F.2d 629, 633 (6th Cir. 1980) ("While the evidence clearly demonstrates a 'working relationship' between local and federal authorities in this case, there is no evidence which indicates that this relationship was 'illegitimate,' or that 'the state officials unlawfully detained [the defendant] in order to allow the federal investigator to secure a confession.'" (citation omitted)).

The record in this case shows that Myers was transferred to federal custody at approximately 11:00 a.m. on September 7 and was brought before a federal magistrate judge that afternoon — a period of federal detention lasting less than six hours. There is nothing in the record that suggests that he was being held by Roseville police in order to secure a confession. There is no evidence that any interrogation attempts were made by police officers or federal agents while Myers was detained at the Roseville police department. *Cf. United States v. Carter*, 910 F.2d 1524, 1528 (7th Cir. 1990) ("Although it is clear from the record that the federal authorities were working with the Chicago police on the robbery investigation . . . Defendant did not show that [the

FBI agent] refrained from participating in the arrest and subsequent interrogation so that a confession could be obtained without having to comply with federal presentment requirements."). Myers confessed while under arrest at his house. Myers also does not contest that his confession was voluntary. Without more, section 3501 forecloses suppression under the circumstances.

IV. Conclusion

The good faith exception to the exclusionary rule prevents suppression of the evidence and ensuing confession at the scene, despite the illegality of the warrant issued to search the 2nd premises. The delay in presenting the defendant to a judicial officer is not long enough to trigger exclusion of his confession under the *McNabb-Malory* rule.

Accordingly, it is **ORDERED** that the defendant's motion to suppress evidence and statements (ECF No. 17) is **DENIED**.

It is further **ORDERED** that the defendant's motion to suppress his statement due to delay in presentment (ECF No. 16) is **DENIED**.

s/David M. Lawson  
DAVID M. LAWSON  
United States District Judge

Date: January 23, 2019

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first-class U.S. mail on January 23, 2019.

s/Susan K. Pinkowski  
SUSAN K. PINKOWSKI